**PUBLIC JUSTICE**
F. Paul Bland, Jr.
1825 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 797-8600
Facsimile:  (202) 232-7203
Email:  *PBLAND@publicjustice.net*

-    and -

**REESE LLP**
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Telephone: (212) 643-0500
Facsimile:  (212) 253-4272
Email: *mreese@reeserichman.com*

**HALUNEN LAW**
Melissa Wolchansky
1650 IDS Center
80 S 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 605-4098
Facsimile:  (612) 605-4099
Email: *Wolchansky@halunenlaw.com*

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUSTIN T. BASSETT, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ELECTRONIC ARTS INC.,<br><br>Defendant. | Case No. 1:13-cv-04208-MKB-SMG<br><br>**PLAINTIFF JUSTIN T. BASSETT'S OBJECTION TO THE REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE GOLD ON DEFENDANT ELECTRONIC ARTS, INC'S MOTION TO COMPEL ARBITRATION** |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

LEGAL ARGUMENT ........................................................................................ 4

    I.    THE ARBITRATION CLAUSE WAS NOT INCORPORATIONED INTO A BINDING CONTRACT, AND IT IS, THEREFORE, UNENFORCEABLE ........ 4

        A.  The Terms of Service Were Not Incorporated as a Shrinkwrap Agreement ................................................................................... 5

        B.  The Terms of Service Were Not Incorporated When Mr. Bassett Clicked "I Accept" ......................................................................... 9

    II.   THE MAGISTRATE COMMITTED A CLEAR ERROR AND REACHED A CONCLUSION CONTRARY TO LAW BY RULING THAT THE ARBITRATION CLAUSE IN THE TERMS OF SERVICE WAS NOT ILLUSORY ..................................................................................... 11

        A.  The Analysis of Whether a Promise is Illusory Does Not Depend on Whether That Promise Involved Longstanding Employment Relationships or Claims Touching on "Substantial Rights" .................... 13

        B.  The Fact that Defendant Posts Changed Terms on a Page of its Website Without Alerting Consumers to the Timing or Substance of the Change is Not Sufficient to Meet the Notice Requirement Under Governing Law and Recognized in All the Cited Cases ............... 15

        C.  Mr. Bassett Need  Not Have Suffered Prejudice for the Arbitration Clause to be Considered Illusory ......................................... 17

CONCLUSION ................................................................................................ 19

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*AT&T Techs., Inc. v. Commc'ns Workers,*
    475 U.S. 643 (1986) ............................................................................. 4

*Applied Energetics, Inc. v. Newoak Capital Mkts., L.L.C.,*
    645 F.3d 522 (2d Cir. 2011) .............................................................. 4

*BG Grp., Pub. Ltd. v. Republic of Arg.,*
    134 S. Ct. 1198 (2013) ....................................................................... 4

*Blair v. Scott Specialty Gases,*
    283 F.3d 595 (3d Cir. 2002) ............................................................ 17

*Bonnant v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    467 F. App'x 4 (2d Cir. 2012) .......................................................... 4

*Carnival Cruise Lines, Inc. v. Shute,*
    499 U.S. 585 (1991) ........................................................................... 7

*Day v. Fortune Hi-Tech Mktg.,*
    536 F. App'x 600 (6th Cir. 2013) .................................................... 12

*Douglas v. U.S. Dist. Court,*
    495 F.3d 1062 (9th Cir. 2007) .......................................................... 7

*Dumais v. Am. Golf Corp.,*
    299 F.3d 1216 (10th Cir. 2002) ...................................................... 18

*Dumais v. Am. Golf Corp.,*
    150 F. Supp. 2d 1182 (D.N.M. 2001) ........................................... 12

*Duncan v. Wells Fargo Home Mortg., Inc.,*
    487 F. App'x 427 (9th Cir. 2012) .................................................... 9

*Ellig v. Moina,*
    No. 12 Civ. 7927(KBF), 2014 WL 521210 (S.D.N.Y. Feb. 10, 2014) .................................. 9

*Ferguson v. Lion Holding, Inc.,*
    312 F. Supp. 2d 484 (S.D.N.Y. 2004) ............................................ 9

*Floss v. Ryan's Family Steak Houses, Inc.,*
    211 F.3d 306 (6th Cir. 2000) ...........................................................17

*Granite Rock Co. v. Int'l Bhd. Of Teamsters,*
    581 U.S. 287 (2010) ........................................................................... 4

*Grosvenor v. Qwest Corp.*,
    854 F. Supp. 2d 1021 (D. Colo. 2012) .................................................................. 14, 17-18

*Harris v. Blockbuster Inc.*,
    622 F. Supp. 2d 396 (N.D. Tex. 2009) ................................................................... 14

*Hill v. Gateway 2000*,
    105 F.3d 1147 (7th Cir. 1997) ................................................................................. 7-8

*Hines v. Overstock.com, Inc.*,
    380 F. App'x 22 (2d Cir. 2010) ............................................................................... 7

*In re Zappos, Inc.*,
    893 F. Supp. 2d 1058 (D. Nev. 2012) ..................................................................... 14

*Int'l Paper Co. v. Suwyn*,
    951 F. Supp. 445 (S.D.N.Y. 1997) .......................................................................... 9

*Lebowitz v. Dow Jones & Co.*,
    508 F. App'x 83 (2d Cir. 2013) ............................................................................... 15

*Morrison v. Amway Corp.*,
    517 F.3d 248 (5th Cir. 2008) ................................................................................... 12

*Penn v. Ryan's Family Steak Houses*,
    269 F.3d 753 (7th Cir. 2001) ................................................................................... 12

*Perez v. Hospitality Ventures Denver L.L.C.*,
    245 F. Supp. 2d 1172 (D. Colo. 2003) ................................................................... 12

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ................................................................................... 5-6, 8-9

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) ................................................................................... 5-7, 9

*Specht v. Netscape Communs. Corp.*,
    306 F.3d 17 (2d Cir. 2002) ..................................................................................... 6

*Startech, Inc. v. VSA Arts*,
    126 F. Supp. 2d 234 (S.D.N.Y. 2000) .................................................................... 9

*Trumbull v. Century Mktg. Corp.*,
    12 F. Supp. 2d 672 (N.D. Ohio 1998) .................................................................... 12

*Merkin v. Vonage Am. Inc*,
    No. 13 Civ. 8026 (CAS), 2014 WL 457942 (C.D. Cal. Feb. 3, 2014) .................... 16, 17

**State Court Opinions**

*24 Hour Fitness, Inc. v. Superior Court*,
  66 Cal. App. 4th 1199 (1998) ......................................................... 15

*Badie v. Bank of Am.*,
  67 Cal. App. 4th 779, 79 Cal. Rptr. 2d 273 (1998) ........................... 17

*Cheek v. United Healthcare of the Mid- Atl., Inc.*,
  835 A.2d 656 (Md. 2003) ............................................................... 12

*In re Ins. Installment Fee Cases*,
  211 Cal. App. 4th 1395 (2012) ......................................................... 9

*Passante v. McWilliam*,
  53 Cal. App. 4th 1240 (1997) ......................................................... 10

*Salazar v. Citadel Communs. Corp.*,
  90 P.3d 466 (N.M. 2004) ............................................................... 12

*Sears Roebuck & Co. v. Avery*,
  593 S.E.2d 424 (N.C. Ct. App. 2004) .............................................. 13

*Serpa v. Cal. Sur. Investigations, Inc.*,
  215 Cal. App. 4th 695, 155 Cal. Rptr. 3d 506 (2013) .................... 15-17

**Rules**

Fed. R. Civ. P. 72(a) .................................................................... 18

## INTRODUCTION

This action alleges that Defendant Electronic Arts ("Defendant" or "EA") deceived and misled consumers, many of whom are young adults and children, into purchasing EA's software products based upon false pretenses made on the very packaging of the products themselves. The products at issue in this action are video games EA labeled as being for online play (the "Products" or "Product"). This prominent front-of-label packaging representation signified to consumer that they would be able to play the video games live with friends, family, and others through the Internet. Moreover, online play offers a unique gaming experience for consumer that is not available when just playing the computer. Unfortunately for consumers, EA's representations were untrue, as consumer cannot play the games online.

When Mr. Bassett attempted to retain the benefits promised to him on the Products' packaging, EA moved to enforce an obscure arbitration clause, contained within unenforceable Terms of Service ("TOS"). On February 9, 2015, Magistrate Judge Gold issue a Report and Recommendation (the "Report") (ECF No. 35) that erroneously conflated the concepts of shrinkwrap agreements and clickwrap agreements to find the arbitration clause was part of an enforceable contract - in direct contradiction of binding Second Circuit precedent. Having utilized this erroneous premise to determine that the arbitration clause was within a contract, the Report again contradicted binding precedent to find that the clause was not illusory. It based this conclusion on three erroneous precepts: 1) an arbitration clause can only be illusory if it involves an employment contract or a "substantial right"; 2) EA provided "indirect notice" of a change, as well as a 30-day opt-out period; and 3) an individual must be prejudiced by a change in the arbitration agreement for the clause to be illusory. This was error.

For the reasons stated below, the Court should set aside the Report's recommendations and deny Defendant's Motion to Compel Arbitration.

## STATEMENT OF FACTS

EA is a leading manufacturer of video games that retail for as much as $59.99 or more per title. EA sells millions of these games each year and has profited greatly from the sale of its Products.

Consumers, such as Mr. Bassett, typically buy EA's products in retail stores. The Products are displayed in the retail stores with the front of the packaging prominently displayed to the consumer. The front of the packaging contains all the significant information regarding the game, including the title of the game that reflects what type of game it is (*e.g.* NHL Hockey); the gaming platform that the game can be played on (*e.g.* Xbox ); the price of the game (*e.g.* $59.99); the rating of the game (akin to movies, e.g. E for everyone – children and adults; M for mature – adults only; etc.); and, whether or not the game is intended to be played online for live play with other consumers. The last feature is prominently displayed on the front of the packaging such as follows:



In other words, all of the information that a consumer needs to determine whether or not he or she wants to purchase the Product is displayed on the packaging.

The rest of the packaging is sealed in shrink wrap and can only be unsealed after the consumer has completed his transaction with the store and purchased the game by paying the store for the game.

2

Nowhere on or within the packaging of the Products does it disclose that EA considers any complaint that a consumer might have against EA regarding the Products to be subject to arbitration. Furthermore, for the vast majority of the Class Period arbitration was not even contemplated as EA did not add that term until relatively recently.  Indeed, the arbitration clause was not added until after the Plaintiff had already purchased the Products at issue. In other words, the arbitration clause did not even exist at the time Plaintiff paid for the Products.

 Moreover, even after it was added, the purported arbitration clause is buried in so-called Terms of Service that are only accessible to the consumer after the consumer has already paid for the Product, taken the Product home, unsealed the Product from the shrink-wrap, utilized the Product, and then tried to access the online play. It is only when a consumer accesses the online play, that they are presented with the TOS containing an arbitration clause.

If the consumer disagrees with the arbitration clause, their sole remedy against EA is the cancelation of their account, even though the consumer believes that the packaging of the Product misled him to purchase the Product. There is no refund or return policy. In other words, if a consumer disagrees with the TOS (which, again are only available to the consumer after he has already paid for and utilized the product), their only remedy is to quit using the Product, as EA will not refund him the money already paid for the Product.

Finally, the TOS provides EA with a right to unilaterally modify the contract at any time. The only notice of a change is when EA posts a new version on an obscure portion of their site. According to the TOS, it is the responsibility of the consumer to continually monitor EA's site, and cross check all terms against previous versions to determine if a change has occurred. If and when a change is made, that change becomes effective after 30 days.

Like the typical consumer, Mr. Bassett did not know of the arbitration (indeed, it did not even exist when he purchased the Products at issue) and did not agree to this clause. Rather, like the typical consumer, Mr. Bassett relied upon the information prominently contained on and within the packaging, discussed above, in deciding to complete his transaction and pay his money for the Products.

## **LEGAL ARGUMENT**

## I.   **THE ARBITRATION CLAUSE WAS NOT INCORPORATED INTO A BINDING CONTRACT, AND IT IS, THEREFORE, UNENFORCEABLE**

Mr. Bassett can only be bound by the arbitration clause if the arbitration clause was part of a binding contract. *AT&T Techs., Inc. v. Commc'ns Workers,* 475 U.S. 643, 648 (1986) (internal quotation omitted) ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute he has not agreed so to submit"); *BG Grp., Pub. Ltd. v. Republic of Arg.*, 134 S. Ct. 1198, 1206 (2013); *Bonnant v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 46*7 F. App'x 4, 7 (2d Cir. 2012). In determining whether a binding agreement to arbitrate was ever formed between Mr. Bassett and EA, the federal presumption in favor of arbitration does not come into play. *Applied Energetics, Inc. v. Newoak Capital Mkts.,* LLC, 645 F.3d 522, 526 (2d Cir. 2011) ("while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."). Moreover, these questions as to formation of a valid arbitration agreement are always for a court, not an arbitrator, to decide. *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 299 (2010)

To be enforceable, the purported EA arbitration clause has to either have been: (1) incorporated as part of the initial point of purchase contract; or (2) part of a new contract formed at the time the online play was accessed. The Report conflated these two very distinct legal

events, and therefore, improperly concluded that the arbitration clause was enforceable.  For the reasons set forth below, this Court should reject the Report and properly conclude that the arbitration clause contained in EA's TOS is unenforceable.

**A.  The Terms of Service Were Not Incorporated as a Shrinkwrap Agreement**

If the TOS were incorporated in the point of purchase contract, this would be a shrinkwrap case. As clearly evidenced in the findings in the Report, this is not a shrinkwrap case. Indeed, the Report states "the contract made at the point of purchase likely did not include the terms and conditions that govern access to online services."  (Report at 9-10.) Further driving home the point that this cannot possibly be a shrinkwrap case, the Report points out "[t]he terms of service agreements at the center of this motion govern EA Online, an optional feature of the purchased product that only <u>some consumers</u> will choose to activate, and there is accordingly no guarantee that any particular user will confront [the terms of service agreements]."  (Report at 9) (emphasis added).  It cannot follow that only *some* purchasers would be bound to the TOS under a shrinkwrap theory depending on whether they choose to activate EA Online.

Rather, a shrinkwrap agreement requires that the terms be provided to <u>every consumer</u> prior to assenting to the contract. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 125 (2d Cir. 2012) ("The late-arriving terms are necessarily included with the product — they are inside the shrinkwrap with the item being transferred. . . . The purchaser therefore cannot begin using the product until after he or she has been presented with the terms, whether or not the purchaser actually reads them") (internal citation omitted) Post-purchase assent to the terms of a contract is an inherent feature of a shrinkwrap agreement.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428 (2d Cir. 2004) ("in a shrinkwrap context, the consumer does not manifest assent to the shrinkwrap terms at the time of purchase; instead; the consumer manifests assent to the terms by later actions").

5

Accordingly, in the shrinkwrap cases cited in the Report, the contracts all included the terms and conditions when the consumers first received the product—and those terms were incorporated later once the purchaser opened the package.  *See Schnabel*, 697 F.3d at 125 ("in the shrinkwrap cases, when a purchaser opens the packaging for goods and discovers that they are covered by additional provisions, the reasonable purchaser will understand that unless the goods are returned, he or she takes them subject to those provisions.").  But here, the Report states that the TOS <u>were not</u> included in the initial point of purchase contract, and admits that not all consumers will see the TOS.  Therefore, assent cannot possibly be given later.

Despite these findings, the Report then entertains a discussion as to why the plaintiff here was on notice of the TOS at the point of purchase because the "back of the video game packaging refers to the terms of service . . ." — terms the Report admitted just one page earlier were not incorporated in the point of purchase contract. (*See* Report at 11.) The Report seems to suggest that a consumer, while standing in the aisle at Best Buy contemplating a purchase of a video game, must bring his laptop or smartphone, access EA's website, click through various screens to locate the TOS, and then read the hundreds of pages of terms (which, by the way, can be changed by EA on any given day with no notice) written by sophisticated lawyers. This is not the law. Arbitration clauses will only be enforced when parties have received reasonable notice that they have agreed to arbitrate. *Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 30-35 (2d Cir. 2002). Binding precedent in *Schnabel* and *Register.com* prohibit the TOS from being incorporated after-the-fact into the point of purchase contract.

In *Schnabel*, the TOS were sent to the plaintiffs in an email after they completed their purchases. *Schnabel*, 697 F.3d at 116. The Second Circuit stated, "'[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or

6

has reason to know that the other party may infer from his conduct that he assents." *Id.* at 120 (internal citation omitted). The court concluded that in order to assent, the party must be on notice of the terms' existence. *Id.*; *see Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010); *Douglas v. U.S. Dist. Court*, 495 F.3d 1062, 1066 (9th Cir. 2007) ("an offeree cannot actually assent to an offer unless he knows of its existence") (internal citation omitted). In defining this notice, the court stated "[a]n offeree, regardless of apparent manifestation of consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Schnabel*, 679 F.3d at 123. The court very carefully explained why *Schnabel* was not a shrinkwrap case—an analysis that applies here as well. The court explained, "the arbitration provision here was both temporally and spatially decoupled from the plaintiffs' enrollment in and use of [the product]; the term was delivered after initial enrollment and [the product] members such as the plaintiffs would not be forced to confront the terms while enrolling in or using the service or maintaining their memberships." *Id.* at 127. Accordingly, the court found that the critical connection of the terms to the goods was missing. *Id.*

The Report made the argument that the TOS were spatially and temporally decoupled in that only some consumers may ever confront the TOS, (*see* Report at 9-10), but then reached the wrong conclusion. The Report relies on *Carnival Cruise Lines, Inc. v. Shute* and *Hill v. Gateway 2000, Inc.* (neither of which is governing law here within the Second Circuit) to advance the proposition that a consumer can pay now and receive terms later. However, unlike in this case, in both *Shute* and *Hill*, the full terms were provided to the purchaser prior to the acceptance of the agreement. In *Hill*, the terms were shrinkwrapped in every box, and the consumer had 30 days to return the goods. *Hill*, 105 F.3d 1147, 1148 (7th Cir. 1996). Failing to return the computer

constituted the acceptance of the terms. *Id.* In *Shute*, the terms were included on the back of the tickets, which were sent to the plaintiffs' home prior to their acceptance. *Shute*, 499 U.S. 585, 587 (1991). In both cases, acceptance of the terms occurred only after the consumer had an opportunity to review them, with the consumer having remedies (e.g. return of money) if the consumer did not agree with the terms. These cases are not akin to the facts here. Mr. Bassett was never provided the TOS as part of the point of purchase contract. Nor could he receive a refund or otherwise reject the terms if he did not agree with the terms. Accordingly, the pay now, receive terms later formulation does not work here.

In *Register.com*, the Second Circuit further discussed the pay now, terms later concept: "[a] party cannot manifest assent to the terms and conditions of a contract prior to having an opportunity to review them; a party must be given some opportunity to reject or assent to proposed terms and conditions prior to forming a contract." *Register.com*, 356 F.3d at 430. The Second Circuit further emphasized an important distinction that the Report fails to acknowledge,

> Courts have found the timing of contract formation to be extremely important and have held that a party may manifest assent only after being given some opportunity to review the terms. . . . Notably, the "assent first, terms later" arrangement employed by Register.com is distinguishable from "pay now, terms later" arrangements.

*Id.* at n.43 (internal citations omitted). Binding precedents approving the "pay now, terms later" concept all hinge on the important element that we do not have here—the purchaser is provided with the opportunity to review the proposed terms and accept or reject them. Here, the TOS are spatially and temporally decoupled from the purchase and were not provided in the box.

The Report attempts to distinguish *Schnabel* and *Norcia*. (Report at 12-13.) However, the Report fails to recognize that the point of purchase contract was a separate and distinct transaction from the activation agreement. In distinguishing these cases, the Report suggests this

is a clickwrap agreement. However, as explained below, this is also not a clickwrap agreement.

The Report's reasoning is faulty insofar as it suggests in any way that the transaction at issue in this case created a shrinkwrap agreement. Accordingly, this Court should conclude that the arbitration agreement (and the TOS in which it was embedded) was not incorporated into the point of purchase contract under the "shrinkwrap" theory, and should modify or set aside the Report's findings on this point.

**B. The Terms of Service Were Not Incorporated When Mr. Bassett Clicked "I Accept"**

The Report also concludes the arbitration clause is enforceable as it was contained in a clickwrap agreement. (Report at 7-8.) It is not.

The requirements for a valid contract are offer, acceptance, *consideration*, mutual assent, and intent. *Register.com*, 356 F.3d at 427; *Duncan v. Wells Fargo Home Mortg., Inc.*, 487 F. App'x 427 (9th Cir. 2012)"A promise without consideration is, of course, not a contract but simply a promise." *Ellig v. Moina*, 996 F. Supp. 2d 236, 242 (S.D.N.Y. 2014); *see Startech, Inc. v. VSA Arts*, 126 F. Supp. 2d 234, 236 (S.D.N.Y. 2000). The mere performance of an act—access to online play, which was the reason Mr. Bassett paid for the video games in the first place—that EA was obligated to perform, cannot constitute consideration. *Ferguson v. Lion Holding, Inc.*, 312 F. Supp. 2d 484, 494 (S.D.N.Y. 2004); *see Int'l Paper Co. v. Suwyn*, 951 F. Supp. 445, 448 (S.D.N.Y. 1997) ("a promise to perform an existing legal or contractual obligation is, without more, insufficient consideration to support a new contract"); *In re Ins. Installment Fee Cases*, 211 Cal. App. 4th 1395, 1415 (2012) ("[P]ast consideration given for a promise under an existing contract cannot support a separate promise in excess of the promisor's existing contractual obligations"); *Passante v. McWilliam*, 53 Cal. App. 4th 1240, 1247 (Cal. Ct. App. 1997) ("Past consideration cannot support a contract).

Here, EA was obligated under the point of purchase contract to provide access to online play.[1] The entirety of the point of purchase contract was based on the terms as they existed at the time of purchase, including the representations made on the box that the game could be played online. Thus, these representations made access to online play part of the basis of the bargain. N.Y. U.C.C. Law § 2-313(1)(a) ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise"). As such, access to online play was an essential element of the point of purchase contract.

Consequently, at the time Mr. Bassett electronically checked "I Accept," in his home when attempting to access the online play feature, EA already had a preexisting duty to provide him access to online play. As such, access to online play cannot be the consideration on which any purported second "clickwrap" contract rests as it would be past consideration. Therefore, no second "clickwrap" contract was formed, and the TOS and arbitration provision are unenforceable.

The Report describes the online services as an "additional service or application." (Report at 9.) It analogizes this service to that of an Internet-capable phone, in which a consumer is required to agree to terms of service to access applications added after an initial purchase. (Report at 10.) This analogy simply does not fit.

With an iPhone, the consumer has access to an infinite number of applications from an infinite number of third-party companies. Although the platform is produced by Apple, the

---

[1] As discussed above and recognized in the Report, the TOS were not included in the point of purchase contract.

consumer has access to software produced by Google, Facebook, Amazon, etc. The product is simply a conduit to the third-party companies' products. The terms of service are between the third-party company and the consumer; not Apple and the consumer. Apple is held to the terms of the point of purchase contract. These scenarios represent true clickwrap agreements where the consumer cannot access these third-party applications without reviewing and assenting to the third-party's terms. *See Register.com*, 356 F.3d at 429.

This case is far more akin to Frigidaire selling a consumer a refrigerator, but requiring that consumer to sign terms of service to access the freezer. Access to the freezer was part of the basis of the bargain of the point of purchase contract. Since the TOS were not incorporated into the point of purchase contract, and there was no valid consideration to form a second contract, this is not a clickwrap agreement. In the absence of a valid contract containing an arbitration provision, the Court should set aside the Report's conclusions and deny Defendant's Motion to Compel Arbitration.

## II. THE MAGISTRATE COMMITTED A CLEAR ERROR AND REACHED A CONCLUSION CONTRARY TO LAW BY RULING THAT THE ARBITRATION CLAUSE IN THE TERMS OF SERVICE WAS NOT ILLUSORY.

Most arbitration clauses provide that parties may only rewrite or modify the provisions of the clause if there is advance notice to the consumer, and the consumer has the option to a refund for the product or service if the change to the agreement is unacceptable to them. A handful of companies have departed from these good practices, and have adopted clauses that allow the corporation to unilaterally rewrite the terms of the arbitration clause without notice or agreement by the consumer. A host of courts from around the United States, including state supreme courts and federal courts of appeals, in reported decisions that number in the dozens, have held that when a corporation retains such sweeping unilateral power, there is no agreement at all – the resulting document is "illusory" – because there is no promise when one party can change what it

11

is offering to do unilaterally and without notice. *See, e.g., Day v. Fortune Hi-Tech Mktg, Inc.*, 536 Fed. Appx. 600, 604 (6th Cir. 2013) ("Because Defendant retained the ability to modify any term of the contract, at any time, its promises were illusory."); *Morrison v. Amway Corp.*, 517 F.3d 248, 256-57 (5th Cir. 2008) (holding that agreement requiring arbitration was illusory and thus unenforceable because Amway had the unilateral right to amend or revoke the agreement even as to disputes arising before publication of the amendment); *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 759-61 (7th Cir. 2001) (holding arbitration agreement unenforceable for lack of mutual obligation where one party could unilaterally modify the rules of the arbitral forum, making its promise illusory); *Perez v. Hospitality Ventures-Denver LLC*, 245 F. Supp.2d 1172, 1175 (D. Colo. 2003) (an "agreement . . . subject to unilateral modification" is "unilateral rather than mutual and hence no agreement at all") (internal quotations omitted); *Dumais v. Am. Golf Corp.*, 150 F. Supp. 2d 1182, 1193 (D.N.M. 2001) (finding contract illusory and unenforceable where employer could "unilaterally modify the terms at any time"); *Trumbull v. Century Mktg. Corp.*, 12 F. Supp. 2d 683, 686 (N.D. Ohio 1998) (holding that an employment handbook did not create a binding contract where handbook stated that employer could modify or revoke any of the handbook's terms at any time without notice, because "[w]ithout mutuality of obligation, a contract cannot be enforced."); *Cheek v. United Healthcare of the Mid- Atl., Inc.*, 835 A.2d 656, 662-63 (Md. 2003); *Salazar v. Citadel Commc'ns. Corp.,* 90 P.3d 466, 469 (N.M. 2004); *Sears Roebuck & Co. v. Avery*, 593 S.E.2d 424, 432-33 (N.C. Ct. App. 2004) (applying Arizona law).

The Report spends considerable time analyzing the question of whether EA's ability to modify the arbitration clause at any time without providing notice of such modifications to the users of its products renders that arbitration clause illusory. The Report discusses the many cases

12

cited by Mr. Bassett, as well as each of the cases cited by EA, and points out that EA's cases do not actually support its position because the companies in those cases did provide consumers with notice of any changes to their contract terms, or the court inferred such a notice requirement where the agreement did not explicitly contain one. (Report at 15-17.) Judge Gold apparently also conducted "independent research" which also failed to yield any cases upholding unilateral modification schemes like the one at issue in this case. (Report at 16.)

Despite the utter lack of precedent supporting EA's position, Judge Gold nonetheless found the arbitration clause not to be illusory based on three factors that are neither correct nor legally relevant: 1) that the "leading cases" finding arbitration provisions to be unenforceable because they were illusory all involved longstanding employment relationships and claims of "substantial rights," whereas Mr. Bassett's claims involve commercial transactions for goods costing less than $100 (Report at 17-18); 2) that EA provided "indirect notice" of changes to its arbitration clause, as well as a 30-day opt-out period (Report at 18); and 3) that Mr. Bassett was not prejudiced because EA did not amend its arbitration agreement after he registered to use its games. (Report at 18.) None of these factors justify departing from the clearly established principles of contract law that require this arbitration agreement to be disregarded as an illusory promise devoid of mutual consideration.

## A. The Analysis of Whether a Promise Is Illusory Does Not Depend on Whether That Promise Involved Longstanding Employment Relationships or Claims Touching on "Substantial Rights."

Judge Gold surveyed the cases cited in Mr. Bassett's opposition to the motion to compel and found them distinguishable from this case because they involved employment relationships and underlying claims under such statutes as RICO, Title VII and the ADA. But the rule on which these decisions rely – that a promise in which the promisor may change the terms of his promise at any time is illusory and lacks consideration – is a general rule of contract law that is

in no way limited to the employment context or to cases involving certain statutory rights. 3 Richard A. Lord, Williston on Contracts § 7:7 (4th ed. 2013) ("[W]here an illusory promise is made, that is, a promise merely in form, but not actually promising anything, it cannot serve as consideration").

Nor is the Report correct in its apparent assumption that the only cases to find arbitration provisions illusory because of the drafter's authority to unilaterally modify them have arisen in the employment context or involved high-value claims. To the contrary, courts have invalidated arbitration provisions in consumer contracts on the exact same reasoning employed by the courts in the employment cases cited in the Report. *See, e.g.*, *In re Zappos, Inc.*, 893 F. Supp. 2d 1058, 1065-66 (D. Nev. 2012) (collecting cases and "join[ing] those other federal courts that find . . . arbitration agreements illusory and therefore unenforceable" in a case involving statutory and common law claims brought by consumers against an online retailer); *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1023, 1034 (D. Colo. 2012) (holding arbitration clause illusory in a case alleging that an internet service provider improperly raised its rates); *Harris v. Blockbuster Inc.*, 622 F. Supp. 2d 396, 398-99 (N.D. Tex. 2009) (holding arbitration provision illusory in a case where consumers claimed that Blockbuster's policy of sharing their online movie purchases with Facebook violated the Video Privacy Protection Act).

A promise does not become more or less illusory when that promise is made by a retailer as opposed to an employer, when it is made over the internet rather than through some other medium, or because the underlying claims in the lawsuit involve goods of a certain monetary value. Inserting such considerations into the analysis when they appear nowhere in the jurisprudence of contracts would be unfair to the plaintiff here, would create confusion and uncertainty in the law, and would expose future litigants to the risk of inconsistent judgments.

Accordingly, this basis for Judge Gold's Report should be set aside.

**B. The Fact that Defendant Posts Changed Terms on a Page of its Website Without Alerting Consumers to the Timing or Substance of the Changes Is Not Sufficient to Meet the Notice Requirement Under Governing Law and Recognized in All the Cited Cases.**

Judge Gold recognized that the cases cited by EA differed substantially from the situation here with respect to the type of notice that the companies in those cases provided. In both *Lebowitz v. Dow Jones & Co., 50*8 F. App'x 83, 84 (2d Cir. 2013) and *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal. App. 4th 1199, 1214 (1998) relied on by EA, the agreements that survived illusoriness challenges explicitly required the companies to provide written notice of any changes to their terms. In *Serpa v. Cal. Surety Investigation*, where the agreement was silent on the issue of notice, the California Court of Appeals concluded that "implied in the unilateral right to modify is the obligation to do so upon reasonable and fair notice." *Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal. App. 4th 695, 708, 155 Cal. Rptr. 3d 506 (2013).

But the notice provided by EA is neither reasonable nor fair. The introduction to EA's TOS specifies that "EA may modify the Terms of Service at any time" and that "[r]evisions to terms affecting existing EA Services shall be effective thirty (30) days after posting at terms.ea.com." (Windrem Decl., Ex. 11, at ¶ 3.) EA does not provide any written notice alerting its customers that a change has been posted at terms.ea.com, so for this "notice" to be effective, consumers would have to constantly monitor the website on the chance that new terms appear there. Nor does terms.ea.com contain any previous versions of the agreement to which the current version can be compared, or any sort of highlighting of which terms have been changed. Thus the "notice" contemplated by EA here also requires consumers themselves to compare the previous version of the TOS line by line against the version of the TOS found on terms.ea.com on any given day to determine whether any changes have been made.

15

Judge Gold noted that his "independent research has failed to yield" any case "involving passive notice of this type." (Report at 16.) Presumably, the statement of being unable to find any cases directly on point is limited to cases analyzing the issue under the doctrine of illusory promise, for the Report does cite *Merkin v. Vonage America Inc.*, which is on point.

In *Merkin,* a federal district court applying California law found an arbitration provision unconscionable where the only way the internet phone company notified its customers that its terms of service were changing was by posting announcements of such changes on a remote webpage like terms.ea.com. *Merkin v. Vonage America Inc*, 2:13-cv-08026-CAS(MRWx), 2014 WL 457942, at *7 (C.D. Cal. Feb. 3, 2014). The Report does not explain why this factually analogous case was ignored in favor of a conclusory statement, supported by no legal authority whatsoever, that EA's promises under the TOS were not illusory because "EA did provide indirect notice and thirty days within which to learn about and object to any modification." (Report at 18.)

"Indirect notice" that requires consumers to constantly monitor a webpage and flyspeck the version of the TOS found on that webpage for any changes made to the previous version of the TOS is, for all intents and purposes, no notice at all. It is certainly not the "fair and reasonable notice" that the court in *Serpa* required as an implied term where the contract was silent on the issue of notice. *Serpa*, 215 Cal. App. 4th at 708, 155 Cal. Rptr. 3d 506. As a matter of law, the notice provided by EA of changes to its TOS is insufficient to avoid a finding that the arbitration clause included in the TOS is illusory.

16

**C. Mr. Bassett Need Not Have Suffered Prejudice for the Arbitration Clause to be Considered Illusory.**

Finally, Judge Gold cites, as the "most significant[]" reason that Mr. Bassett's illusory argument fails is the fact that Mr. Bassett was not prejudiced by EA's unilateral modification rights, because it has not exercised them since he registered the online games. The Report cites no legal authority for such a prejudice requirement, probably because there is none. To the contrary, with one exception, all of the cases cited in the Report hinge on the authority that the agreement's drafter has to unilaterally amend its terms, regardless of whether that authority was ever exercised. *See, e.g.*, *Day*, 536 Fed. App'x 600 (6th Cir. 2013); *Blair v. Scott Specialty Gases*, 283 F.3d 595 (3d Cir. 2002); *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir. 2000). Moreover, the one exception, the *Merkin* case discussed in the previous section, is the proverbial exception that proves the rule, for the court in *Merkin* explained that its results-oriented outlook was a product of the fact that it was analyzing the issue as one of procedural unconscionability rather than of whether the contract in question was illusory:

> *Serpa* and *Badie* analyzed whether, under general principals of contract law, one party's power to unilaterally modify a contract rendered that contract illusory. *See Serpa*, 215 Cal.App.4th at 706, 155 Cal.Rptr.3d 506; *Badie*, 67 Cal.App.4th at 797, 79 Cal.Rptr.2d 273. Here, by contrast, the Court's focus is not on whether Vonage's power to modify the TOS makes the TOS illusory. Instead, the Court's analysis turns on whether Vonage's actual and repeated modification of the TOS— to the point where the current TOS is in effect a different agreement from the 2004 and 2006 versions of the TOS—"result[ed] in no real negotiation and an absence of meaningful choice," thus making the TOS oppressive.

*Merkin*, 2014 WL 457942, at *7.

In *Grosvenor v. Qwest Corp.*, another case with strikingly similar facts to this one, the defendant made this same lack of prejudice argument in an attempt to defeat the plaintiff's claim that the defendant's arbitration clause, which it could modify unilaterally by posting notice to a remote webpage like terms.ea.com, was illusory. *Grosvenor*, 854 F.Supp.2d at 1034. Citing to

*Dumais v. American Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002), the court in *Grosvenor* found it "irrelevant" that the defendant had not actually changed its arbitration terms. *Id.* It explained: "*Dumais* gave no indication that the employer had to have altered the terms of the arbitration agreement in order for it to be illusory. To the contrary, it recognized that it was the unilateral power of one party to change the arbitration terms that rendered the arbitration provisions illusory." *Id.*

As in *Grosvenor*, *Dumais* and every other case involving the doctrine of illusory promise, the illusory nature of the EA TOS is based on the unilateral power retained by EA under the terms of the contract, not on its past course of conduct or the prejudice that Mr. Bassett has or has not suffered. Importing a prejudice requirement into the illusory promise analysis is contrary to law and is another basis on which the Report should be set aside.

## CONCLUSION

For the foregoing reasons, the Court should set aside the Report and Recommendation as clearly erroneous and contrary to law under Fed. R. Civ. P. 72(a).

Respectfully submitted,

Dated: March 5, 2015

**REESE LLP**

*/s/ Michael R. Reese*
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Telephone:     (212) 643-0500
Facsimile:     (212) 253-4272
Email:         *mreese@reeserichman.com*

**PUBLIC JUSTICE**
F. Paul Bland, Jr.
1825 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 797-8600
Facsimile:  (202) 232-7203
Email:  *PBLAND@publicjustice.net*

**HALUNEN LAW**
Melissa Wolchansky
1650 IDS Center
80 S 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 605-4098
Facsimile:  (612) 605-4099
Email:  *Wolchansky@halunenlaw.com*

*Counsel for Plaintiff and the Proposed Class*

19